**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RACHEL PETERSON, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>*v.*<br><br>TRANSUNION, LLC,<br><br>    Defendant. | Case No:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

Plaintiff, individually and on behalf of all others similarly situated, upon personal knowledge of facts and information and belief, pertaining to herself against Defendant TransUnion ("TransUnion" or "Defendant"), and in support thereof alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiff is among the roughly 4.4 million individuals in the United States who had their sensitive, personally identifiable information ("PII") hacked and exposed as a result of Defendant's failure to properly secure and safeguard their systems.

2.      On or around July 28, 2025, hackers successfully gained unauthorized access to Defendant's systems from a third-party application that stored personal customer data, including Plaintiff's.

3.      This breach exposed over four million individuals' PII, including Social Security numbers (the "Data Breach").

4.     Despite the Data Breach occurring in late July, Defendant did not file official notice of the incident until August 27, 2025, when it notified the Office of the Maine Attorney General.[1]

5.     It was around this time that Defendant sent out letters ("Notice") to individuals—including Plaintiff—notifying them that their personal information had been accessed in the hacking incident.

6.     By the time Notice was sent out, individuals' PII had been exposed for nearly a month.

7.     The Notice Defendant sent to Plaintiff and other affected individuals stated that Defendant had detected unusual activity on some of its computer systems on July 30, 2025. In response, Defendant reportedly investigated the activity, which revealed that an unauthorized party had accessed certain company files.

8.     Once inside Defendant's network, hackers successfully exfiltrated Plaintiff's and Class Members' PII. Despite its sensitivity, Defendant did not have in place adequate security measure in place to prevent its theft.

9.     Defendant owed duties to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their personal information against unauthorized access and disclosure. Defendant breached those duties by, among other things, failing to implement and maintain reasonable security

---

[1] *Data Breach Notifications*, Office of the Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/3dcd9b7c-bce3-4685-bffd-f728ce96e2fd.html.

2

procedures and practices to protect the personal information entrusted to it from unauthorized access and disclosure.

10.     As a result of Defendant's inadequate security practices and breach of its duties and obligations, the Data Breach occurred and Plaintiff's and Class Members' personal information was accessed by, and disclosed to, unauthorized third-party actors.

11.     Upon information and belief, Defendant breached its duties and obligations in one or more of the following ways: (1) failing to design, implement monitor, and maintain reasonable network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data-retention policies; (3); failing to adequately train employees on data security; (4) failing to comply with industry-standard data-security practices; (5) failing to warn Plaintiff and Class Members of Defendant's inadequate security practices; (6) failing to encrypt or adequately encrypt PII; (7) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the harm; (8) failing to utilize widely available software to detect and prevent this type of attack, and (9) otherwise failing to secure the hardware using reasonable and effective data-security procedures.

12.     Defendant understood that, in order to receive services, Plaintiff and Class Members were required to entrust their highly sensitive personal information to Defendant. Plaintiffs and Class Members entrusted this information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

13.    Armed with the PII accessed in the Data Breach, hackers can commit a variety of crimes including, such as opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, and filing fraudulent tax returns using Class Members' information, and giving false information to police during an arrest.

14.    This action seeks to hold Defendant accountable for its inadequate security and the resulting Data Breach. Plaintiff thus brings this Complaint on behalf of herself and all similarly situated individuals whose personal information was stolen as a result of the Data Breach. Plaintiff, on behalf of herself and all other Class Members, brings the below common law tort claims and state-law statutory claims seeking declaratory and injunctive relief, monetary damages (including punitive damages), equitable relief, and all other relief authorized by law.

## PARTIES

15.    Plaintiff Rachel Peterson is a citizen of the State of California and resides in San Diego County. On or about July 28, 2025, upon information and belief, Plaintiff's information was accessed and exfiltrated from Defendant's networks. Plaintiff estimates that she spent approximately three hours responding to the Data Breach by researching the Data Breach. Plaintiff continues to review her accounts for fraud. Plaintiff is very careful about sharing her personal information and has never knowingly transmitted unencrypted personal information over the internet or any other unsecured source. Plaintiff stores any and all documents continuing PII in a secure location and protects any documents she receives in the mail that contain her personal information, or that may contain any

4

information that could otherwise be used to compromise her identity and financial accounts. Moreover, Plaintiff diligently chooses unique usernames and passwords for her various online accounts.

16.     Plaintiff suffered and continues to suffer injuries as a result of the Data Breach, including, among others: (1) loss of privacy; (2) likely misappropriation of her identity, name and likeness; (3) potential fraud and identity theft from the misuse of her stolen personal information; (4) diminution in the value of her personal information due to the loss of security, confidentiality, and privacy; (5) lost value of her personal information; (6) lost time, effort, and expense in responding to and preventing the threats and harm posed by the Data Breach; and (7) a continued substantial and imminent risk of the misuse of her personal information.

17.     Defendant TransUnion LLC is a limited liability company organized under the laws of Delaware, with its principal place of business in Chicago, Illinois. TransUnion is a citizen of both Delaware and Illinois.

## JURISTDICTION AND VENUE

18.     The Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are Class Members who are diverse from Defendant, and (4) there are more than 100 Class Members.

19.     This Court has personal jurisdiction over Defendant because, at all relevant times, Defendant operated its principal places of business in this State and because Defendant took actions in this State that gave rise to the harms at issue here.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because Defendant's principal place of business is in this District and many of Defendant's acts complained of herein occurred within this District.

21.     This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367 because all claims alleged herein form part of the same case or controversy.

## FACTUAL ALLEGATIONS

### A.  Defendant's Collection of Plaintiff's and Class Members' PII

22.     Defendant is one of the largest credit services companies in the world. In the United States alone, Defendant provides millions of consumers with credit services. Defendant employs over 13,000 people and generated roughly $4.18 billion in revenue in 2024.[2]

23.     Defendant warrants to its clients that it "makes trust possible in global commerce" through a view of each consumer based on a "robust set of online, offline, public and proprietary information, stewarded with care."[3]

---

[2] *TransUnion Revenue*, macrotrends https://www.macrotrends.net/stocks/charts/TRU/transunion/revenue.

[3] About TransUnion, Transunion, https://www.transunion.com/about-us.

24. In order to receive credit reports and other credit services, consumers must entrust Defendant with their highly confidential PII. This includes not only full names and birth dates, but also social security numbers.

25. Defendant uses this information to create and maintain accounts, enhance user experiences, and prevent fraud.

26. Defendant's Privacy Notice warrants that it employs safeguards to ensure that customers' PII is secure against hackers and other third parties:

> We maintain a comprehensive information security program with administrative (policies, standards and processes), physical, and technical controls designed to protect the confidentiality, integrity, and accessibility of personal information. When handling categories of sensitive personal information such as Social Security numbers, we: (i) protect the confidentiality of Social Security numbers, (ii) prohibit their unlawful disclosure, and (iii) limit access to them only to the individuals for whom access is required for the performance of their job duties and the purpose for which the Social Security numbers were collected.[4]

27. Despite these guarantees, Defendant inadequately secured the personal information it collected over many years of providing its services, including by aggregating and storing information in the server that would ultimately be accessed and exfiltrated by unauthorized users during the Data Breach.

28. Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiffs and Class Members.

---

[4] *TransUnion Customer & Partner Portal Privacy Notice*, TransUnion, https://www.transunion.com/privacy/portal.

29.     By obtaining, collecting, and storing Plaintiff's and Class Members' personal information, Defendant assumed legal and equitable duties and knew that it was responsible for protecting Plaintiff's personal information from unauthorized disclosure.

**B.  The Data Breach**

30.     On or around July 28, 2025, cybercriminals gained unauthorized entry to Defendant's system and accessed the PII of at least 4,461,511 individuals.

31.     Nearly a month later, on August 27, 2025, Defendant finally began to notify affected customers via the Notice letters that its investigation had determined that their PII had been compromised.

32.     The Notice letters were sparse. Notably, the Notices do not include details about who the cybercriminals were, the third-party application that was used to hack into Defendant's system, or the remedial measures taken to repair and secure Defendant's systems after the Data Breach. Plaintiff and Class Members still have no information as to whether their PII remains vulnerable to further attacks.

33.     This so-called Notice letter, therefore, provided no meaningful disclosure to Plaintiff and Class Members, as it fails to provide any substantive facts with specificity. As such, Plaintiff and Class Members are left without the information they need to mitigate potential further harm.

34.     In addition, the Notice offers no substantive steps to help Plaintiff or Class Members to protect themselves. Rather, Defendant offers just two years of credit monitoring—a remedy that is woefully inadequate given that Plaintiff and Class Members now face lifelong risk of fraud and identity theft as a result of the Data Breach.

8

35.     While Defendant has yet to provide specific information regarding the Data Breach, sources suspect that the attack can be attributed to the ShinyHunters threat group—hackers known to be targeting Salesforce CRM customers in social engineering attacks.[5]

**C. Defendant Knew It Was at High Risk of a Data Breach**

36.     Defendant knew it was storing and permitting its employees to use a CRM (customer relationship management system) with its internal network service to transmit valuable and highly sensitive personal information and that, as a result, Defendant's systems would be attractive targets for cybercriminals.

37.     Defendant also knew that a breach of its system, and exposure of the information therein, would result in the increased risk of identity theft and fraud against the individuals whose personal information was compromised.

38.     Defendant knew or should have known that immediate action was necessary to limit access to and disclosure of the personal information entrusted to it. However, it failed to do so and caused Plaintiff's and Class Members' highly sensitive personal information to be exposed to the public.

39.     These risks are not theoretical. Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued warnings to potential targets, so that they are aware of, and prepared for, a potential attack.

---

[5] *See, e.g.*, Emma Woollacott, *Everything we know about the Allianz Life data breach so far*, IT Pro (July 28, 2025), https://www.itpro.com/security/data-breaches/everything-we-know-about-the-allianz-life-data-breach-so-far.

40.     In tandem with the increase in data breaches, the rate of identity theft also has increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[6]

41.     According to the Identity Theft Resource Center's 2023 Data Breach Report, the overall number of publicly reported data compromises in 2023 increased more than 72% over the previous high-water mark and 78% over 2022.[7]

42.     According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[8]

43.     Even if stolen personal information does not include financial or payment card account information, it does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as

---

[6] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute (last visited July 25, 2025), https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20.

[7] *2023 Annual Data Breach Report*, Identity Theft Resource Center (Jan. 2024), *available at* https://www.idtheftcenter.org/wp-content/uploads/2024/01/ITRC_2023-Annual-Data-Breach-Report.pdf.

[8] United States Government Accountability Office, *Report to Congressional Requesters, Personal Information* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

social engineering or spear phishing. In these forms of attack, the criminal uses the personal information such as name, address, email address, and affiliations to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

44.     The cybercriminals that now possess Plaintiff's and Class Members' PII can now easily obtain their tax returns or open fraudulent credit card accounts in Plaintiff's and Class Members' names.

45.     Plaintiff and Class Members provided their PII to Defendant with the reasonable expectation that Defendant would comply with the obligations created by contract, industry standards, common law, and its own representations to keep their PII confidential and secure from unauthorized access and disclosure. Plaintiff and Class Members further relied on Defendant to provide them with timely notice in the event of a data breach.

46.     Plaintiff and Class Members would not have entrusted Defendant with their PII had they known Defendant would not comply with these obligations.

47.     Despite having actual knowledge of both the high risk posed by a data breach and the steps necessary to prevent and mitigate damage stemming from a data breach, Defendant failed to secure its systems against the cyber attack it suffered on July 28, 2025.

**D. Defendant Knowingly Failed to Implement Sufficient Cybersecurity Measures**

48.    Defendant did not have adequate cybersecurity monitoring systems in place to prevent unauthorized access to its networks.

49.    Cybersecurity or process monitoring involves "continuously observing and analyzing your computer network or systems to prevent cyberattacks. The primary objective of monitoring in cybersecurity is quickly identifying signs of vulnerability and responding to potential security threats in real-time."[9]

50.    The Data Breach should have been noticed by Defendant through proper endpoint and network monitoring and scanning.

51.    Defendant also should have employed IP whitelisting. Whitelisting is a security practice that involves creating a list of trusted IP addresses granted access to a specific server, application, or network. By using IP whitelisting, only pre-approved IP addresses can interact with your system.  Restricting access to a select group of devices based on their IP addresses can limit exposure to potential attacks and unauthorized access. The method effectively controls access to critical business systems, cloud infrastructure, and online services.

52.    The United States Department of Commerce has produced guidance for application whitelisting—NIST Special Publication 800-167: *Guide to Application Whitelisting*—which provides specific guidance to companies on how to implement

---

[9] Cyber Security Monitoring: Definition and Best Practices, SentinelOne, https://www.sentinelone.com/cybersecurity-101/cybersecurity/cyber-security-monitoring/#:~: text=and%20their%20benefits.-,What%20Is%20Cyber%20Security%20Monitoring?, prevention%20and%20detection%20of%20threats.

whitelisting, to prevent "installation and/or execution of any application that is not specifically authorized for use on a particular host. This mitigates multiple categories of threats, including malware and other unauthorized software."[10]

53.    Defendant has not made public what steps, if any, it took after discovering the breach on July 30, 2025, besides notifying the Office of the Maine Attorney General.

54.    What is clear, however, is that Defendant failed to communicate clearly with anyone after the Data Breach, including Plaintiff or the Class Members.

55.    Defendant discovered the breach on July 30, 2025; however, Defendant did not announce the breach until August 27, 2025. This allowed for a 27-day period in which cybercriminals were able to expose Plaintiff's and the Class Members' data to the public, unbeknownst to Plaintiff and the Class Members.

56.    This means that from July 30 to August 27, 2025, Plaintiff and Class members lost valuable time to guard against the misuse of their stolen personal information. During these 27 days, Plaintiff and Class Members were robbed of the opportunity to freeze their credit cards, set up credit monitoring, or change their credentials. Because of Defendant's failure to communicate with the affected individuals, Plaintiff's and Class Members' injuries stemming from the Data Breach increased substantially in severity.

---

[10] *NIST Special Publication 800-167, Guide to Application Whitelisting*, NIST (Oct. 2015), https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-167.pdf.

**E. The Dark Web**

57.     Plaintiff's and Class Members' information has been exposed and is on the dark web.

58.     The dark web is a part of the World Wide Web that is not accessible through traditional internet browsers. The term "dark web" is used to distinguish from the "clear web," the part of the World Wibe Web that is readily accessible through traditional internet browsers. The dark web is accessed through The Onion Router ("Tor"), a privacy-focused communication system designed to enable anonymous internet browsing. It achieves this by routing web traffic through multiple volunteer-operated servers (relays), encrypting data at each step to ensure that both the user's location and browsing activity are difficult to trace. Tor uses a technique called "onion routing," where data is encrypted in layers like an onion. Each relay in the network peels away a layer of encryption before passing data to the next relay. This ensures that no single relay knows both the origin and destination of the data.

59.     The dark web poses significant challenges to cybersecurity professionals and law-enforcement agencies. The dark web is legal to access and operate, and it has some legitimate applications and sites. But its hidden nature and employment of multi-level encryption make detecting and monitoring illegal activity difficult. Unlike sites on the clear web, sites on the dark web do not advertise their existence. The anonymity of the dark web has led to the creation of a number of markets and forums which traffic in illegal

14

merchandise and content, including stolen personal information.[11]

60.     Once stolen personal information is posted on the dark web, it is distributed to multiple different groups and individuals, each of whom can use that information for fraud and identity theft.[12]

61.     This data lifecycle has been confirmed through experiment. In 2015, researchers at BitGlass created a list of 1,568 phony names, Social Security numbers, credit card numbers, addresses, and phone numbers, rolled them in an Excel spreadsheet, and then "watermarked" it with their code that silently tracks any access to the file.[13] The data was quickly spread across five continents: North America, Asia, Europe, Africa, and South America. I was downloaded by 47 different parties— mainly users in Nigeria, Russia, and Brazil, with the most activity coming from Nigeria and Russia.[14] This experiment demonstrated that data released on the dark web quickly spreads around the world.

---

[11] *Crime and the Deep Web*, Stevenson Univ. (last visited Nov. 26, 2024), https://www.stevenson.edu/online/about-us/news/crime-deep-web/; *Defending Against Malicious Cyber Activity Originating from Tor*, CISA (last updated Aug. 2, 2021), https://www.cisa.gov/news-events/cybersecurity-advisories/aa20-183a.

[12] HHS, The Dark Web & Cybercrime (last updated July 23, 2020), https://www.hhs.gov/sites/default/files/dark-web-and-cybercrime.pdf ).

[13] Kelly Jackson Higgins, *What Happens When Personal Information Hits the Dark Web*, Dark Reading (Apr. 7, 2015), https://www.darkreading.com/cyberattacks-data-breaches/what-happens-when-personal-information-hits-the-dark-web; Kristin Finklea, *Dark Web*, Nat'l Sec. Archive (July 7, 2015), https://nsarchive.gwu.edu/media/21394/ocr; *Dark Web*, Congressional Research Service (last updated Mar. 10, 2017), https://crsreports.congress.gov/product/pdf/R/R44101.

[14] Pierluigi Paganini, *How Far Do Stolen Data Get in the Deep Web After a Breach?*, Security Affairs (Apr. 12, 2015), https://securityaffairs.com/35902/cyber-crime/propagation-data-deep-web.html.

**F. Effects of the Data Breach**

62. Personal information is valuable property. Its value is axiomatic, considering the market value and profitability of "Big Data" to corporations in America. Illustratively, Alphabet Inc., the parent company of Google, stated in its 2020 Annual Report a total annual revenue of $182.5 billion and net income of $40.2 billion.[15] $160.7 billion of this revenue derived from its Google business, which is driven almost exclusively by leveraging personal information collected from users of its various free products and services.

63. Criminal law also recognizes the value of personal information by imposing prison sentences for the theft of personal information. This strong deterrence is necessary because cybercriminals extract substantial revenue through the theft and sale of personal information. Once a cybercriminal has unlawfully acquired personal information, the criminal can demand a ransom or blackmail payment for its destruction, use the personal information to commit fraud or identity theft, or sell the personal information to other cybercriminals on the black market.

64. The U.S. Government Accountability Office ("GAO") released a report in 2007 regarding data breaches, finding that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[16] This has not changed over the nearly two decades since the report was released.

---

[15] *Alphabet Inc., Annual Report (Form 10-K)*, SEC, at 32 (Feb. 3, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001652044/000165204421000010/goog-20201231.htm.

[16] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* ("GAO Report") at 2, GAO (June 2007), https://www.gao.gov/assets/270/262899.pdf.

65.     The GAO Report explains that "[t]he term 'identity theft' is broad and encompasses many types of criminal activities, including fraud on existing accounts—such as unauthorized use of a stolen credit card number—or fraudulent creation of new accounts—such as using stolen data to open a credit card account in someone else's name." Identity thieves use personal information for a variety of crimes, including credit-card fraud, phone or utilities fraud, and bank/finance fraud.[17] According to Experian, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to, among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; withdraw funds using a debit-card number; obtain a new driver's license or ID; or falsely submit the victim's information in the event of arrest or court action.[18]

66.     With access to an individual's personal information, criminals can do more than just empty the victim's bank account—they can also commit all manner of fraud, including obtaining a driver's license or official identification card in the victim's name

---

[17] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things: "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number. *Id.*

[18] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Private Information and How Can You Protect Yourself*, Experian (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

but with the thief's picture; using the victim's name and Social Security number to obtain government benefits; or filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[19]

67.     Identity theft presents many challenges.  In a survey, the Identity Theft Resource Center ("ITRC") found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[20]

68.     Theft of Social Security numbers creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new Social Security number, a breach victim has to demonstrate ongoing harm from misuse of their Social Security number, and a new Social Security number will not be provided until after the victim experiences the harm.

69.     Due to the highly sensitive nature of Social Security numbers, theft of Social Security numbers in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity.

70.     Beyond monetary losses and fraud, data breaches also have a deep, psychological impact on their victims.

> In some ways, a cyber attack can feel like the digital equivalent of getting robbed, with a corresponding wave of anxiety and dread.

---

[19] *Id.*

[20] *ITRC Annual Data Breach Report 2023*, ITRC (2023), https://www.idtheftcenter.org/publication/2023-data-breach-report/.

> Anxiety, panic, fear, and frustration—even intense anger—are common emotional responses when experiencing a cyber attack. While expected, these emotions can paralyze you and prolong or worsen a cyber attack.[21]

71.     Plaintiff and Class Members have suffered injuries in a number of ways, including:

- Loss of benefit of their bargain, for individuals who provided compensation to entities to safely transfer and store their data with Defendant or Defendant's vendors;

- Loss of value of their personal information, in that it has been misused for purposes to which they did not consent, and they have not been properly compensated for this misuse;

- Actual or attempted fraud, misuse, or identity theft caused by the Data Breach, including, but not limited to, their information being published to the clear, deep, and dark web; and

- Time and expenses that were reasonably spent to mitigate the impact of the breach, including the cost of credit monitoring.

72.     Plaintiff and Class Members have already experienced actual or attempted fraud, which is reasonably related to the Data Breach, and which demonstrates that the Data Breach has put them at immediate risk for additional harm.

73.     The fraud and attempted fraud that certain Class Members have suffered is sufficiently related to the Data Breach because of the time frame in which it occurred (after the Data Breach), and because the same information that was exposed in the Data Breach would have been used to effectuate the fraud and identity theft.

---

[21] Amber Steel, *The Psychological Impact of Cyber Attacks*, LastPass (Aug. 17, 2022), https://blog.lastpass.com/posts/the-psychological-impact-of-cyber-attacks.

74.     The harm already suffered by Plaintiff demonstrates the risk of harm to Plaintiff and Class Members is present and ongoing.

**G.  It Is Reasonable for Individual Victims of Data Breaches to Expend Time and Money to Mitigate Their Risk of Harm**

75.     Cybercriminals can and do use the exact personal information that Defendant was entrusted to safeguard to perpetrate financial crimes that harm Plaintiffs and Class Members.

76.     The FTC recommends that identity theft victims take several steps to protect their personal information after a data breach, including contacting one of the three credit bureaus to place a fraud alert (and to consider an extended fraud alert that lasts for seven years if identity theft occurs), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[22]

77.     There may also be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and also between when personal information is stolen and when it is used. According to the GAO Report: "[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that

---

[22] *Identity Theft Recovery Steps*, FTC Steps (last visited Nov. 26, 2024), https://www.identitytheft.gov/. Indeed, the FTC takes data breaches seriously, and has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive information can constitute an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[23]

78.     Personal information is such an inherently valuable commodity to identity thieves that, once it is compromised, criminals often trade the information on the cyber black-market for years.

79.     There may be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average, it takes approximately three months for a consumer to discover their identity has been stolen and used and it takes some individuals up to three years to learn that information.[24]

80.     Furthermore, data breaches that expose any personal data, and in particular non-public data of any kind, directly and materially increase the chance that a potential victim is targeted by a spear phishing attack in the future, and spear phishing results in a high rate of identity theft, fraud, and extortion.[25]

81.     Plaintiff and Class Members' stolen data will continue to be leaked and traded on the dark web, meaning Plaintiff and Class Members will remain at an increased

---

[23] GAO Report, *supra*, n.16.

[24] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

[25] *See* Leo Kelion & Joe Tidy, *National Trust Joins Victims of Blackbaud Hack*, BBC News (July 30, 2020), https://www.bbc.com/news/technology-53567699 (concluding that personal information such as "names, titles, telephone numbers, email addresses, mailing addresses, dates of birth, and, more importantly, donor information such as donation dates, donation amounts, giving capacity, philanthropic interests, and other donor profile information . . . in the hands of fraudsters, [makes consumers] particularly susceptible to spear phishing—a fraudulent email to specific targets while purporting to be a trusted sender, with the aim of convincing victims to hand over information or money or infecting devices with malware").

risk of fraud and identity theft for many years into the future. Indeed, some Class Members are in the very early stages of their lives—in their twenties and thirties. Thus, as the respective Data Breach Notice advises, customers, including Plaintiff and Class Members, must vigilantly monitor their financial accounts for many years to come.

## H. Damages Can Compensate Victims for the Harm Caused by the Data Breach

82.    Defendant has refused to provide adequate compensation for Plaintiff's and Class Members' injuries.

83.    The personal information exposed in the Data Breach has real value, as explained above. Plaintiff and the Class Members have therefore been deprived of their rights to control of that property and have lost the value they might otherwise have incurred from that data.[26]

84.    Plaintiff and the Class Members have already spent significant time, and will spend much more, monitoring their accounts, changing login credentials, and recovering from the inevitable fraud and identity theft which will occur, which deserves to be compensated. Defendant has not made compensation or other remedies available for these very real injuries.

85.    Similarly, Defendant has yet to offer any compensation for the aggravation, agitation, anxiety, and emotional distress that Plaintiff and the Class members have suffered, and will continue to suffer, as a result of the Data Breach: the knowledge that

---

[26] Ravi Sen, *Here's How Much Your Personal Information Is Worth to Cybercriminals – and What They Do with It*, PBS (May 14, 2021), https://www.pbs.org/newshour/science/heres-how-much-your-personal-information-is-worth-to-cybercriminals-and-what-they-do-with-it.

their information is out in the open, available for sale and exploitation at any time in the future is a real harm that also deserves compensation.

86.     Plaintiff and Class Members were also deprived of the benefit of their bargain when they interacted with Defendant: Defendant had a duty to take reasonable steps to protect the personal information of the individuals whose information was entrusted to them and those individuals entrusted that information in exchange for Defendant taking on that duty. This duty was inherent in Defendants' relationships with Plaintiff and Class Members, whether through express contractual terms, implied contractual terms, bailment, or statutory or implied duties of good faith and fair dealing.

87.     Defendant has not taken sufficient steps or even attempted to make impacted class members whole. Defendant has failed in their duty to protect Plaintiffs' and Class Members' personal information and has failed in its duty to help these consumers protect themselves in the future.

## I. Defendant Breached Their Duty to Protect Plaintiff's and Class Members' Private Information

88.     Defendant's cybersecurity practices and policies were inadequate and fell short of the industry-standard measures that should have been implemented long before the Data Breach occurred.

89.     However, because Defendant markets and advertises itself as securely handling highly sensitive personal information, Defendant assumed legal and equitable duties and knew or should have known it was responsible for:

- adequately designing, maintaining, and updating their software and networks;

- ensuring compliance with industry standards related to data security;

- ensuring compliance with regulatory requirements related to data security;

- protecting and securing the personal information stored on their networks from unauthorized disclosure; and

- providing adequate notice to customers and individuals if their personal information is disclosed without authorization.

90.   Defendant failed to use the requisite degree of care that a reasonably prudent company would use in designing, developing, and maintaining networks that store highly sensitive personal information.

91.   Defendant should have implemented industry standard security protocols to mitigate the risk of a Data Breach.

92.   In addition to mitigating the risk of stolen credentials, the Cybersecurity and Infrastructure Security Agency (CISA) guidance encourages organizations to prevent unauthorized access by:

- adequately designing, maintaining, and updating their software and networks;

- promptly detecting, remediating, and notifying their customers of any critical vulnerabilities in their software and networks;

- ensuring compliance with industry standards related to data security;

- ensuring compliance with regulatory requirements related to data security;

- protecting and securing the personal information stored on their networks from unauthorized disclosure; and

- providing adequate notice to customers and individuals if their personal information is disclosed without authorization.

93.     The CISA guidance further recommends use of a centrally managed antivirus software utilizing automatic updates that will protect all devices connected to a network (as opposed to requiring separate software on each individual device), as well as implementing a real-time intrusion detection system that will detect potentially malicious network activity that occurs prior to ransomware deployment.[27] Likewise, the principle of least privilege ("POLP") should be applied to all systems so that users only have the access they need to perform their jobs.[28]

94.     Not only should Defendant have had measures like these in place to prevent compromise in the first place, Defendant should have also properly siloed their systems so that a bad actor would be unable to escalate privileges and move laterally through Defendant's systems.

95.      Defendant's lack of segmented systems, which are common to cloud-based servers, allowed the hacker to travel among Defendant's systems freely, compromising multiple systems which Defendant was unable to recover.

96.     CISA guidance recommends that using a comprehensive network, in addition to network segregation, will help contain the impact of an intrusion and prevent or limit lateral movement on the part of malicious actors.

97.     Despite holding the PII millions of individuals, Defendant failed to adhere to

---

[27] CISA, *Understanding Anti-Virus Software*, https://www.cisa.gov/news-events/news/ understanding-anti-virus-software.

[28] CISA, *Weak Security Controls and Practices Routinely Exploited for Initial Access*, https://www.cisa.gov/news-events/cybersecurity-advisories/aa22-137a).

these recommended best practices. Indeed, had Defendant implemented common sense security measures, the hackers never could have accessed millions of individuals' files and the Data Breach would have been prevented or been much smaller in scope. Defendant also lacked the necessary safeguards to detect and prevent cybersecurity attacks and failed to implement adequate monitoring or control systems to detect the unauthorized infiltration after it occurred.

98.     Defendant, like any entity their size storing valuable data, should have had robust protections in place to detect and terminate a successful intrusion long before access and exfiltration could expand to millions of individuals' files. Defendant's below-industry-standard procedures and policies are inexcusable given their knowledge that it was a prime target for cyberattacks.

99.     Defendant's failure to follow industry standard cybersecurity protocols directly resulted in the Data Breach and the compromise of Plaintiff and Class Members' personal information.

## J.  Defendant Failed to Follow Industry Standards

100.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[29]

101.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. These

---

[29] *Start with Security: A Guide for Business*, FTC (June 2015), https://www.ftc.gov/ system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[30]

102.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[31]

103.    The FTC further recommends that companies not maintain personal information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

104.    The FTC has brought enforcement actions against businesses for failing to reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses

---

[30] *Protecting Personal Information: A Guide for Business,* FTC (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[31] *Id.*

must take to meet their data security obligations.[32] Defendant was fully aware of their obligation to implement and use reasonable measures to protect the personal information of their consumers but failed to comply with these basic recommendations and guidelines that would have prevented this breach from occurring. Defendant's failure to employ reasonable measures to protect against unauthorized access to consumer information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 US.C. § 45.

**K. Plaintiff and Class Members Suffered Damages**

105. Defendant received Plaintiff's and Class Members' personal information in connection with providing certain financial services to them. In requesting and maintaining Plaintiff's personal information for business purposes, Defendant expressly and impliedly promised, and undertook a duty, to act reasonably in its handling of Plaintiff's and Class Members' personal information. Defendant did not, however, take proper care of Plaintiff's and Class Members' personal information, leading to its exposure to and exfiltration by cybercriminals as a direct result of Defendant's inadequate security measures.

106. For the reasons mentioned above, Defendant's conduct, which allowed the Data to occur, caused the Plaintiff and Class Members significant injuries and harm in several ways. Plaintiff and Class members must immediately devote time, energy, and money to: (1) closely monitor their bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently

---

[32] *Privacy and Security Enforcement*, FTC (last visited Jan. 13, 2025), https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement.

than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them. Plaintiff and Class Members have taken or will be forced to take these measures in order to mitigate their potential damages as a result of the Data Breach.

107.    Once personal information is exposed, there is little that can be done to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct.

108.    Further, the value of Plaintiff's and Class Members' personal information has been diminished by its exposure by the Data Breach. Plaintiff and Class Members did not receive the full benefit of their bargain when paying for financial services, and instead received services that were of a diminished value to those described in their agreements with Defendant for the benefit and protection of Plaintiff and Class Members and their respective personal information. Plaintiff and Class Members were damaged in an amount at least equal to the difference in the value between the services they thought they paid for (which would have included adequate data security protection) and the services they received.

109.    Plaintiff and Class Members would not have obtained services from Defendant or paid the amount they did to receive such services, had they known that Defendant would negligently fail to protect their personal information. Indeed, Plaintiff

and Class Members paid for services with the expectation that Defendant would keep their personal information secure and inaccessible from unauthorized parties. Plaintiff and Class Members would not have obtained services from Defendant had they known that Defendant failed to properly train its employees, lacked safety controls over its computer network, and did not have proper data security practices to safeguard their personal information from criminal theft and misuse.

110.    As a result of Defendant's failures, Plaintiff and Class Members are also at substantial and certainly impending increased risk of suffering identity theft and fraud or other misuse of their personal information.

111.    From a recent study, 28% of consumers affected by a data breach become victims of identity fraud—this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[33]

112.    Plaintiff and Class Members are also at a continued risk because their information remains in Defendant's computer systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its consumers' personal information.

113.    In addition, Plaintiff and Class Members have suffered emotional distress as

---

[33] Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KNOWBE4 (last visited Apr. 17, 2023), https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud.

a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private information to strangers.

## CLASS ALLEGATIONS

114.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), individually and on behalf of all members of the following nationwide class:

> **Nationwide Class:** All residents of the United Stated who had their personal information compromised due to the Data Breach.

115.    Excluded from the Class are Defendant's officers and directors; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Also excluded from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

116.    The Class is so numerous that joinder is impracticable. While the exact number of Class members is unknown to Plaintiffs, Defendant has disclosed that the Class consists of over 4.4 million persons, most of which are likely United States residents.

117.    **Commonality.** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

> a. Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' personal information;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the personal information compromised in the Data Breach;

c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws;

d. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards and state and federal regulatory requirements, including the FTC Act;

e. Whether Defendant was subject to and breached contractual obligations to adhere to the FTC Act in its business association agreements;

f. Whether Defendant owed a duty to Class Members to safeguard their personal information;

g. Whether Defendant breached its duties to Class Members to safeguard their personal information;

h. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i. Whether Defendant should have discovered the Data Breach earlier;

j. Whether Defendant's delay in issuing notice to Plaintiff and the Class caused them harm;

k. Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

l. Whether Defendant's conduct was negligent;

m. Whether Defendant breached its bailment duties;

n. Whether Defendant failed to provide notice of the Data Breach in a timely manner;

o. Whether Defendant was unjustly enriched due to its use of Plaintiff's and the Class's personal information while failing to protect it; and,

p. Whether Plaintiff and Class Members are entitled to damages, civil penalties, treble damages, and/or injunctive relief.

118. **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiffs' personal information, like that of every other Class Member, was compromised in the Data Breach, causing them common injury, which was due to the same misconduct—Defendant's inadequate data security.

119. **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of the Class Members. Plaintiff's counsel is competent and experienced in litigating class actions.

120. **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all of Plaintiff's and Class Members' personal information was stored on the same computer system and unlawfully accessed by authorized users in the same way due to the same security deficiencies. Defendant's misconduct caused common injuries that affect all Class Members. Defendant's common course of wrongdoing and the common, class-wide injuries create common legal and factual issues that predominate over any individualized issues. Adjudication of these common issues in a single action advances the interests of judicial economy.

121. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation concerning the same facts and law. Moreover, this case furthers the quintessential purpose of a class action, which is to afford Class Members with common injuries to pursue collective litigation where their individual damages are small. Given the size of the Plaintiff's and Class Members' individual damages, the costs of individual litigation would likely exceed any award, leaving Plaintiff and Class Members with effectively no remedy for their harm. Additionally, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications. In contrast, litigating this matter as a class action presents far fewer management difficulties, conserves judicial and party resources, and protects the rights of each Class Member.

122. Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

## CAUSES OF ACTION

### COUNT I
### Negligence
### (On behalf of Plaintiff and the Nationwide Class)

123.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

124.    Defendant, via its business operations and its function as a custodian of data, collected, maintained, stored, used, analyzed, and processed Plaintiff's and Class Members' highly sensitive personal information, including Social Security numbers.

125.    Defendant understood the need to adequately protect that sensitive information and the serious risk a data breach poses to consumers, such as Plaintiff and the Class. Defendant, furthermore, was subject to state and federal regulations, including the FTC Act and state-law equivalents, that required Defendant to implement reasonable physical, technical, and administrative safeguards to protect consumer information from unauthorized access, use, or disclosure.

126.    Further, given the value of the private data to Defendant and its business model and the well-known misuse of personal information by cybercriminals, Defendant also fully understood that consumer data has significant monetary value. Defendant knew or should have known that, should that sensitive data be accessed by unauthorized users, it would likely be sold on the dark web to fraudsters, putting consumers, including Plaintiff and the Class Members, at significant risk that their personal information would be used for fraudulent purposes. Indeed, the fact that Defendant *itself* profited from the data that

comprises Plaintiff's and Class Members' personal information demonstrates that Defendant knew or should have known the importance of data security.

127.    Given the highly sensitive nature of the data, and the foreseeable risk of a Data Breach, Defendant owed Plaintiffs and the Class Members a duty to exercise reasonable care in securing the highly sensitive personal information that Defendant collected, maintained, stored, used, analyzed, and processes as part of its businesses.

128.    Defendant owed this duty to Plaintiff and Class Members because Plaintiff and the Class are a well-defined, and foreseeable group of individuals whom Defendant should have been aware could be injured by Defendant's inadequate data storage and security. The foreseeable harm to Plaintiff and Class Members of Defendant's inadequate data security measures and the fact that Defendant was the only entity capable of protecting Plaintiffs' and Class Members' data within its possession created a duty to act reasonably in securing personal information.

129.    Additionally, Defendant assumed a duty to Plaintiff and the Class to protect their sensitive personal information. Defendant represented that it would comply with the FTC Act to implement measures to reasonably safeguard the sensitive information within its possession. As such, when intermediaries provided Defendant with Plaintiff's and Class Members' personal information and Defendant accepted and stored that data (for its own purposes and to its own financial benefit), Defendant assumed a duty to protect that personal information.

130.    Defendant also owed a duty to timely and accurately disclose the scope, nature, and occurrence of the Data Breach. This disclosure is necessary so that Plaintiff

and the Class can take appropriate measures to avoid unauthorized use of their personal information and accounts, cancel and/or change usernames and passwords on compromised accounts, monitor their accounts to prevent fraudulent activity, contact their financial institutions about compromise or possible compromise, obtain credit monitoring services, and/or take other steps in an effort to mitigate the harm caused by the Data Breach and Defendant's unreasonable misconduct.

131.    Despite this duty, Defendant did not implement reasonable data security and negligently maintained Plaintiff's and Class Members' personal information. For example, Defendant lacked internal cybersecurity monitoring of Defendant's systems and failed to adequately segregate sensitive information from Defendant's other systems.  Each of these failures contravenes well-established, basic industry standards, expert recommendations, and basic requirements for reasonable data security.

132.    Defendant knew that its failure to use reasonable measures to protect Class Members' personal information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the well-known high frequency of cyberattacks and data breaches in the past few years.

133.    Defendant's negligent data security actually and proximately caused Plaintiff's and Class Members' injuries because they directly allowed hackers to easily access Plaintiff's and Class Members' personal information. This ease of access allowed the hackers to steal the personal information of Plaintiff and the Class, resulting in the dissemination of that data on the dark web.

134.    As a direct and proximate result of Defendant's misconduct, Plaintiff and the Class have suffered theft of their personal information. Defendant allowed cybercriminals to access Class Members' personal information, thereby decreasing the security of Class Members' financial accounts, making their identities less secure and reliable, and subjecting them to the imminent threat of identity theft. Not only will Plaintiff and the Class have to incur time and money to re-secure their bank accounts and identities, but they will also have to protect against identity theft for years to come.

135.    As a direct and proximate result of Defendant's inadequate security and the resulting Data Breach, Plaintiff and Class Members suffered and will continue to suffer significant injuries, including, but not limited to: (1) loss of privacy; (2) misappropriation of their identity, name and likeness; (3) fraud and identity theft from the misuse of their stolen personal information; (4) diminution in the value of their personal information due to the loss of security, confidentiality, and privacy; (5) lost value of their personal information; (6) emotional and mental distress and anguish resulting from the access, theft and posting of their personal information; (7) lost time, effort and expense responding to and preventing the threats and harm posed by the Data Breach; and (8) a continued substantial and imminent risk of the misuse of their personal information.

136.    Plaintiff and the Class seek all monetary and non-monetary relief allowed by law, including any: economic damages; damages for emotional and mental anguish; nominal damages; enhanced or treble damages available under the law; court costs; reasonable and necessary attorneys' fees; injunctive relief; and any other relief available by law and which the court deems proper.

## COUNT II
### Negligence *Per Se*
### (On behalf of Plaintiff and the Nationwide Class)

137.    Plaintiff restates and realleges the preceding allegations above as if fully alleged herein.

138.    Plaintiff brings this claim individually and on behalf of the Class.

139.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendant for failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant' duty to protect Plaintiff's and Class Members' sensitive PII.

140.    Defendant breached its duties to Plaintiff and Class Members under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of a data breach involving PII of its employees, former employees and business associates.

141.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se.*

142.    The harm that has occurred as a result of Defendant's conduct is the type of harm that the FTC Act and Part 2 was intended to guard against.

143.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have been injured as described herein, and are entitled to damages, including compensatory, and nominal damages, in an amount to be proven at trial.

## COUNT III
### Third Party Beneficiary – Breach of Contract
### (On behalf of Plaintiff and the Nationwide Class)

144.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

145.    Plaintiff and Class Members have an interest, both equitable and legal, in the PII about them that was conveyed to, collected by, and maintained by Defendant and that was ultimately accessed or compromised in the Data Breach.

146.    As a recipient of employees', former employees', and business associates' PII, Defendant has a fiduciary relationship to Plaintiff and Class Members.

147.    Because of that fiduciary relationship, Defendant was provided with and stored private and valuable PII belonging to Plaintiff and the Class. Plaintiff and the Class were entitled to expect their information would remain confidential while in Defendant's possession.

148.    Defendant owed a fiduciary duty under common law to Plaintiff and Class Members to exercise the utmost care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

149.    As a result of the parties' fiduciary relationship, Defendant had an obligation to maintain the confidentiality of the information within Plaintiff's and the Class Members' records.

150.    Defendant had possession and knowledge of confidential PII of Plaintiff and Class members, information not generally known.

40

151. Plaintiff and Class members did not consent to nor authorize Defendant to release or disclose their PII to unknown criminal actors.

152. Defendant breached its fiduciary duties owed to Plaintiff and Class members by, among other things: mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of employee information that resulted in the unauthorized access and compromise of PII; mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; failing to design and implement information safeguards to control these risks; failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; failing to evaluate and adjust its information security program in light of the circumstances alleged herein; failing to detect the breach at the time it began or within a reasonable time thereafter; failing to follow its own privacy policies and practices; and failing to adequately train and supervise employees and third-party vendors with access or credentials to systems and databases containing sensitive PII.

153. But for Defendant's wrongful breach of its fiduciary duties owed to Plaintiff and Class members, their PII would not have been compromised.

154. As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiff and Class Members have suffered injuries, including:

- Theft of their PII;

- Costs associated with the detection and prevention of identity theft and unauthorized use of their PII;

- Costs associated with purchasing credit monitoring and identity theft protection services;

- Lowered credit scores resulting from credit inquiries following fraudulent activities;

- Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

- The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

- Damages to and diminution in value of their PII entrusted, directly or indirectly, to with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

- Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

- Emotional distress from the unauthorized disclosure of PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

155.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## COUNT IV
## Breach of Bailment
### (On behalf of Plaintiff and the Nationwide Class)

156.   Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

157.   Defendant, via its business operations, collected, maintained, stored, used, analyzed, and processed Plaintiff's and Class Members' highly sensitive personal information, including Social Security numbers. Defendant collected this personal information as part of its efforts to further its profit and gain an advantage against its competitors.

158.   As discussed above, PII is highly valuable. Plaintiff and Class Members delivered their personal information—i.e., a bailment—to Defendant with the understanding that Defendant would hold their personal information securely and for the specific and limited purpose of informing their credit reports.

159.   A bailee such as Defendant has a legal duty (independent of any contractual duty) to exercise ordinary care to protect the subject of the bailment (Plaintiff's and Class Members' personal information) from negligent loss, damage, or destruction.

160.   By accepting Plaintiff's and the Class Member's personal information, Defendants assumed a duty to faithfully secure Plaintiff's and Class Member's personal information while it remained in Defendant's possession.

161. Defendant understood the need to adequately protect that sensitive information and the serious risk a data breach poses to consumers, such as Plaintiff and the Class. By accepting Plaintiff's and Class Members' personal information, Defendant assumed a duty to implement reasonable physical, technical, and administrative safeguards to protect Plaintiff's and Class Members' personal information from unauthorized access, use, or disclosure.

162. Because Defendant failed to fulfill its duty to protect Plaintiff's and Class Members' personal information, Defendant breached its bailment with Plaintiff and Class Members.

**COUNT V**
**Unjust Enrichment**
**(On behalf of Plaintiff and the Nationwide Class)**

163. Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

164. Defendant received a substantial monetary benefit from Plaintiff and the Class by the collection, maintenance, and use (for its own benefit) of their personal information. Defendant has made substantial gains through the collection and analysis of Plaintiff's and Class Members' personal information, which Defendant obtained under the promise of securing consumer data from unauthorized access and to comply with the FTC Act and other state and federal requirements to implement reasonable measures to protect that personal information.

165. Specifically, Defendant derived value by collecting, using, analyzing Plaintiff's and Class Members' personal information. Defendant sold the information and

analyses of it to other entities, thereby deriving a substantial benefit. Defendant, without any knowledge of the Plaintiff and the Class, had unfettered rights to use Plaintiff's and Class Members' for its own business profit.

166.    Defendant further profited from the use, sale, and analysis of Plaintiff's and Class Members' personal information, which it used to maximize profit, increase its ability to compete with competitors, and obtain additional revenue at the expense of consumers like Plaintiff and the Class.

167.    Furthermore, Defendant saved money by: (1) devoting knowingly inadequate resources to securing Defendant's servers and networks despite its knowledge that the servers were out of data and lacked adequate protections; and (2) failing to prioritize timely notifying Plaintiff and Class Members that their personal information was impacted in the Data Breach, preventing Plaintiff and the Class for taking measures to protect against harm stemming from the misuse of their data.

168.    Defendant would be unable to engage in its regular course of business without collecting personal information from Plaintiff and Class Members.

169.    Defendant's acceptance of the benefits of Plaintiff's and Class Members' personal information under the facts and circumstances is unfair, unjust, and inequitable.

170.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary benefit belonging to Plaintiff and Class Members.

171.    If Plaintiff and Class Members had known that Defendant had not secured their personal information or that it used the information for its own financial gain, Plaintiff and the Class would not have agreed to provide their personal information to Defendant to

make unfettered use of that information, all while failing to implement reasonable safeguards to protect it.

172.   Plaintiffs and Class Members have no adequate remedy at law.

173.   Due to Defendant's unjust enrichment, Plaintiff and Class Members suffered and will continue to suffer significant injuries, including, but not limited to: (1) loss of privacy; (2) misappropriation of their identity, name and likeness; (3) fraud and identity theft from the misuse of their stolen personal information; (4) diminution in the value of their personal information due to the loss of security, confidentiality, and privacy; (5) lost value of their personal information; (6) emotional and mental distress and anguish resulting from the access, theft and posting of their personal information; (7) lost time, effort and expense responding to and preventing the threats and harm posed by the Data Breach; and (8) a continued substantial and imminent risk of the misuse of their personal information.

174.   Plaintiff and the Class also remain at heightened risk of future injury because their personal information resides with Defendant and, further, because Defendant continue to gather new highly personal and private information on Plaintiffs and the Class. Without the use of adequate data security requirements, Plaintiff and the Class remain at a heightened and substantial risk that their personal information will be subject to another data breach.

175.   Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from the use of Plaintiff's and Class Members' personal information.

## COUNT VI
### Declaratory Judgment
### (On behalf of Plaintiff and the Nationwide Class)

176. Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

177. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

178. An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class Members' personal information and whether Defendant currently maintain data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their personal information.

179. Plaintiff alleges that Defendant's data security measures remain inadequate. Plaintiff and Class Members will continue to suffer injury as a result of the compromise of their personal information and remain at imminent risk that further compromises of their personal information will occur in the future.

180. That risk stems from Defendant's retention of Plaintiff's personal information, and its continued collection and aggregation of new information in the normal course of business through Defendant's processing and resolution of insurance claims. Defendant, thus, will continue to receive new and additional information concerning

Plaintiff and the Class and, consequently, Plaintiff and the Class remain at substantial risk of a subsequent breach resulting in the theft of additional personal information.

181. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

- Defendant continues to owe a legal duty to secure Plaintiff's and Class members' personal information and to timely notify Plaintiff and Class Members of a data breach under the common law, Section 5 of the FTC Act, and various state statutes.

- Defendant continues to breach this legal duty by failing to employ reasonable measures to secure Plaintiff's and Class members' personal information.

182. The Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect Plaintiff's and Class Members' personal information.

183. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach. The risk of another data breach is real, immediate, and substantial. If another breach occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

184. The hardship to Plaintiff and Class Members, if an injunction does not issue, exceeds the hardship to Defendant if an injunction is issued. Among other things, if Defendant allows another data breach to occur, Plaintiff and Class Members will likely be subjected to fraud, identify theft, and other harms described herein. On the other hand, the

cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant have a pre-existing legal obligation to employ such measures.

185. Issuance of the requested injunction will not do a disservice to the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach of Defendant's systems, thus eliminating the additional injuries that would result to Plaintiff and the Class whose personal information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

a. For an Order certifying this action as a Class action and appointing Plaintiff as Class Representative and their counsel as Class Counsel;

b. For a declaration of rights regarding the reasonable protection of Plaintiff's personal information that remains in Defendant's possession and maintenance;

c. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class members' personal information;

d. For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of personal information compromised during the Data Breach;

e.  For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

f.  Ordering Defendant to pay for not less than five years of credit monitoring services for Plaintiff and the Class;

g.  For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

h.  For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i.  Pre- and post-judgment interest on any amounts awarded; and

j.  Such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: October 17, 2025

Respectfully submitted,

/s/ *Kenneth A. Wexler*

Kenneth A. Wexler
Justin N. Boley
Zoran Tasic
Andrew J. Grant
**WEXLER BOLEY & ELGERSMA LLP**
311 S. Wacker Drive, Suite 5450
Chicago, Illinois, 60606
Tel: (312) 346-2222
kaw@wbe-llp.com
jnb@wbe-llp.com
zt@wbe-llp.com
ajg@wbe-llp.com

Daniel E. Gustafson (*pro hac vice forthcoming*)
Shashi K. Gowda (*pro hac vice forthcoming*)
Frances Mahoney-Mosedale (*pro hac vice forthcoming*)
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street #2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
sgowda@gustafsongluek.com
fmahoneymosedale@gustafsongluek.com

*Attorneys for Plaintiff and the Putative*

*Class*